**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**In re:** **Chapter 13**

**KARL DUDLEY CRAWFORD and CHERYL ANNETTE CRAWFORD,** **Case No.: 8:15-bk-10162-CPM**

**Debtors.**
**___________________________________/**

**COLLEEN REDIGER, and MARK REDIGER,** **Adversary Proceeding**

**Plaintiffs,** **Case No.**

**v.**

**KARL DUDLEY CRAWFORD,**

**Defendant.**
**___________________________________/**

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS

Plaintiffs and creditors Mark and Colleen Rediger ("Plaintiffs" or the "Redigers"), by and through their counsel, hereby files this Complaint against Karl Dudley Crawford ("Crawford" or the "Defendant"), to determine the dischargeability of certain of Defendant's debts to Plaintiffs pursuant to 11 U.S.C. § 523(a)(2) & (a)(6). In support thereof, Plaintiffs state as follows:

## PARTIES, JURISDICTION, AND VENUE

1. On October 6, 2015 (the "Petition Date"), the Defendant filed a voluntary petition in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, seeking relief pursuant to Chapter 13 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

2. John Waage has been appointed as the Trustee over the case.

3. Plaintiffs are creditors of the Defendant, listed on Schedule F (Doc. 1) and therefore have standing to file this action.

4. Defendant is a Florida resident who resides in Pasco County, Florida.

5. Crawford Construction Company, LLC ("CCC"), was a Florida limited liability company during the period of time the allegations contained herein occurred and was administratively dissolved on January 13, 2015. Up until the time CCC was dissolved, it was doing business in Pasco County, Florida.

6. Defendant was an owner and the manager of CCC, and upon information and belief, was the sole owner. CCC, however, was not listed on the Debtor's Schedules.

7. This Complaint commences an adversary proceeding pursuant to Fed. R. Bankr. P. 7001 *et seq.*

8. Jurisdiction over this matter and over the Defendant is proper in this district, pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 523.

9. Venue over this matter is proper in this district, pursuant to 28 U.S.C. § 1409.

10. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and 28 U.S.C. § 157(b)(2).

**FACTUAL BACKGROUND**

11. Mark Rediger grew up in a law enforcement family, his stepfather was the captain of the police force. As Plaintiffs met and talked with Defendant and negotiated for the construction of their dream retirement home, they learned that Defendant was a Pasco County deputy sheriff and apparently a church-going man.

12. Defendant's position in law enforcement and his apparent religious ties provided Plaintiffs substantial comfort that he was an honorable man they could trust.

13. Defendant learned of Mark Rediger's background and his family's long involvement in law enforcement and Defendant used that knowledge to exploit his position as a deputy sheriff to induce Plaintiffs to contract with him for the construction of their home.

14. Defendant made numerous false statements of material fact which are delineated herein below.

15. To induce the Redigers to contract with him and to continue to trust his judgment and decisions in constructing their home, Defendant appeared at meetings in his sheriff's truck and with his gun on his hip and his badge displayed.

16. On or about January 7, 2014, Defendant and CCC entered into a contract with Plaintiffs to demolish their existing home and construct a new residential home located at 12705 2nd Isle, Hudson, Florida, for the sum of $168,200 (the "Contract"). A copy of the Contract is attached hereto as **Exhibit "A"**.

17. As stated in Article 5 of the Contract, the plans and specifications were to be furnished by CCC.

18. The plans were sealed by a Florida registered engineer and submitted by Defendant to Pasco County for approval and the issuance of the appropriate building permits.

19. As a part of the Contract, CCC provided a Certificate of Insurance (the "COI"), to evidence the proper and required insurance coverages for the project. A copy of the COI is attached hereto as **Exhibit "B"**.

20. On or about February 4, 2014, Plaintiffs entered into a Construction Loan Agreement (the "Loan Agreement"), with TD Bank, N.A. ("TD Bank"). A copy of the Loan Agreement is attached hereto as **Composite Exhibit "C"**.

21. The Loan Agreement provided for periodic payment draws to be paid to CCC which draw amounts constituted the principal amount of a loan from TD Bank, which amounts Plaintiffs had agreed to repay to TD Bank.

22. Defendant executed the Loan Agreement on February 5, 2014, as a beneficiary of the Loan Agreement, and he agreed to comply with the requirements for requesting and receiving draws on the loan.

23. Defendant made various promises to Plaintiffs in order to induce them to execute the Contract and authorize draws from TD Bank.

24. Additionally, Article 5 of the Contract provided as follows:

> *"Any alteration or deviation from the attached description of work and specifications, including but not limited to any such alterations of deviation involving additional material and/or labor costs, will be execute only upon written order for same, signed by Owner and Contractor, and if there is any charge for such alteration or deviation, the additional charge will be added to the contract price of this contract."*

Additionally, Article 5 goes on to state that:

> *"All work shall be completed in a workmanlike manner and in compliance with all building codes and applicable law."*

and,

> *"To the extent required by law, all work shall be performed by individuals duly licensed and authorized by law to perform said work."*

25. At the time the Defendant made those representations in the Contract, Defendant knew that he did not intend to meet those representations.

26. In addition, during the construction, each of the periodic draw requests by Defendant contained a statement executed by Defendant as follows

> Construction to date is in compliance with the plans and specifications. Documentation for all changes/extra work has been included. General

Liability and Worker's Compensation Insurances remain in full force and effect.

See **Composite Exhibit "D"** attached hereto.

27. In addition, a "Loan Disbursement Worksheet" was also executed by Defendant as the contractor and contained the following agreed upon disbursement schedule:

| | | |
|---|---|---|
| First Disbursement | 15% | $ 25,230.00 |
| Second Disbursement | 22% | $ 37,004.00 |
| Third Disbursement | 15% | $ 25,230.00 |
| Fourth Disbursement | 20% | $ 33,640.00 |
| Fifth Disbursement | 25% | $ 42,050.00 |
| Sixth/Final Disbursement | 3% | $ 5,046.00 |
| TOTAL | 100% | $168,200.00 |

In fact, due in part to improper requests made by the Defendant to TD Bank, the draws were disbursed as follows:

| | |
|---|---|
| Disbursement on or about 3/25/14 | $ 10,290 |
| Disbursement on or about 7/16/14 | $ 25,230 |
| Disbursement on or about 7/23/14 | $ 37,004 |
| Disbursement on or about 8/27/14 | $ 18,640 |
| Another Disbursement on or about 9/9/14 | $ 12,000 |
| Disbursement on or about 10/27/14 | $ 20,000 |
| Disbursement on or about 12/9/14 | $ 11,500 |
| Disbursement on or about 12/20/14 | $ 21,400 |
| **TOTAL DISBURSED BY TD BANK TO DEFENDANT** | **$156,064** |

28. However, each of the executed draw requests was an intentional and knowing misrepresentation to the Defendants and TD Bank in order to induce the funding of the loan from TD Bank to pay his draws.

29. In fact, the work performed by CCC, if it was performed at all, was intentionally inferior. Issues include but are not limited to the following:

a). No ties or proper strapping into the pilasters as required by the Florida Building Code ("Code") and shown on the plans;

b). The post and beam system ties are not as specified on the plans;

c). The gyp board in the garage ceiling was not to Code; or consistent with the plans;
d). The roofing material submitted to Pasco County for the issuance of a permit is not what was installed on the roof;
e). No attic insulation installed as required by Code;
f). Improper electrical work and failure to use a licensed electrician;
g). Aluminum and paint on exterior of house is not in conformity with plans or specifications;
h). Failure to provide side jamb framing as shown on plans;
i). Failure to provide Worker's Comp coverage for employees as required by law;
j). Failure to provide turn-down edge on walkway to side garage entry door or below exterior stair pad as indicated on the permit drawings;
k). Failure to correctly install post anchors at all exterior footings for the exterior stairs and elevated deck as indicated on the permit drawings;
l). Failure to provide full width patio and/or turn-down edge at rear patio as indicated on the permit drawings;
m). Failure to provide correct and/or inadequate connection anchoring from beam to beam and posts to beams at the exterior stairs, elevated deck and roof cover above as indicated on the permit drawings;
n). Failure to provide correct beams between the posts carrying the elevated deck and related roof cover above as indicated on the permit drawings;
o). Incorrect substitution of materials with inferior, cheaper materials; and
p). Failure to provide and/or completely install the correct roofing materials for the seacoast zone location where installed.

30. Defendant was fully aware and consciously intended each of these failures in order to increase his profit on the job, and knowingly concealed these failures and misrepresented the status of the construction.

31. By executing the draw requests, Defendant knowingly falsified the documents with the intent to induce the Plaintiffs and TD Bank to pay money to Defendant and CCC.

32. On or about July 15, 2014, Defendant received a draw in the amount of $37,004.00 and promptly purchased a new home for himself. Upon information and belief, Defendant used the draw funds in the purchase of the home.

33. Most egregiously, on December 22, 2014, Defendant requested and received a draw in the amount of $21,400.00, then promptly went on vacation. Defendant returned and on January 13, 2015, advised the Plaintiffs that he was now unable to complete the project.

34. Additionally, during the project Defendant persuaded August Electric, Inc. to pull an electrical permit from Pasco County, but August Electric, Inc., did not in fact perform any of the work; Defendant and/or CCC employees performed all the electrical work that was done on the project until it was abandoned in January, 2015. A copy of the permit is attached hereto as **Exhibit "E"**.

35. Additionally, Defendant and CCC failed to provide Worker's Compensation insurance coverage as required by law. See the Certificate of Insurance attached hereto as Exhibit "B" which shows no coverage for Worker's Compensation.

36. Every time Defendant made a draw request, he misrepresented the status of his insurance coverage in order to induce Plaintiffs and TD Bank to fund his draw requests.

37. Defendant further provided or caused to be provided to TD Bank and the Plaintiff, a false Certificate of Insurance ("Builder's Risk COI"), showing a Builder's Risk policy written by Scottsdale Insurance Company, Policy #JHJQN. A copy of Builder's Risk COI is attached hereto as **Exhibit "F"**.

38. In fact, the agent that issued that Builder's Risk COI now states that the Builder's Risk COI issued to for the aforementioned policy was in error and that no such policy was actually paid for or in place.

39. Defendant further submitted an addendum to the City Building Department, changing the original roof plans from a corrugated metal roof to a standing seam type roof with specified materials.

40. What Defendant in fact, installed, was not what was submitted for approval to the Building Department but was inferior and damaging to the project.

41. Defendant did not bother to submit those changes to the Building Department, nor to the engineer of record, nor to Plaintiffs, but actively concealed it and misrepresented to the Plaintiffs what he had done.

42. To make matters even worse, the roofing materials Defendant and CCC provided was specifically prohibited by the manufacturer for use in close proximity to salt water, which this project is directly on the water, and consequently, the manufacturer refused to warranty any of the roof and the property of the Plaintiffs was damaged. Again, this was a conscious choice by Defendant to defraud Plaintiffs.

43. Even worse, Defendant's foreman Joe Mesianas has admitted that Defendant lied about his experience with metal roof installation, and in fact had no experience installing metal roofs.

44. As a result of these fraudulent acts, Plaintiffs have suffered substantial damages which are set forth below:

| Item | Amount |
|---|---|
| • Costs to complete Contract work | $ 61,567.20 |
| • Cost to Remove & Replace Roof | $ 35,693.00 |
| • Cost to correct defective/inferior work by Crawford | $ 42,814.56 |
| • Reimbursement for Rediger check to Crawford | $ 5,000.00 |
| • Additional materials paid directly by Rediger | $ 5,025.48 |
| • Civil Theft Treble Damages | $218,357.04 |
| • Less actual Civil Theft without Treble Damages | ($ 72,785.68) |
| • Expert Fees as of August 15, 2015 | $ 15,680.00 |
| • Legal Fees as of August 15, 2015 | $ 14,363.75 |
| • Early withdraw penalty incurred by Redigers to fund Repairs and completion of their retirement home | $ 36,600.00 |
| • Lift truck for Paint Services, Inc. to inspect roof areas | $ 1,291.66 |
| • Extended Builder's Risk premium | $ 761.13 |

45. To summarize some, but not all of the knowingly willful and wanton false and misleading statements made by Defendant to intentionally induce Plaintiffs to contract with him

to build their dream retirement home and to pay him substantially more money than he was rightfully entitled:

a) The false and misleading statements knowingly made in the Contract drafted by Defendant, including the statements that all work would be performed by licensed individuals authorized by law to perform said work;

b) The false statements to Pasco County Building Department to induce them to issue an electrical work permit in the name of August Electric, Inc., when in fact, August Electric, Inc., did not perform any work on the project;

c) The false statements made on each and every draw request stating that all work had been performed in accordance with the plans and specifications;

d) The false statements Defendant made that Worker's Compensation Insurance remained in full force and effect when, in fact, none was ever provided on the draw requests and otherwise;

e) The false and misleading statements made to Pasco County, to the engineer of record, and to the Plaintiffs, regarding the roof materials, notwithstanding the unilateral and unauthorized changes Defendant made to the roof specification solely in order to reduce the cost to Defendant while never correspondingly reducing that cost to Plaintiffs; and

f) The false and inflated monthly billing/draw requests made to induce Plaintiffs to pay for work never performed, performed with cheaper materials than those agreed upon, and work performed not in a workmanlike manner.

46. Rather than use the funds from the draws to pay for the proper materials, workmanship, and insurance, Defendant converted the "savings" to his personal use and accounts.

47. All conditions precedent to this action have occurred, have been waived, or have otherwise been satisfied.

**COUNT I**
**Determination of Non-Dischargeability**
**Pursuant to 11 U.S.C. § 523(a)(2)**

48. This is an action to determine the non-dischargeability of certain debts pursuant to 11 U.S.C. § 523(a)(2).

49. Paragraphs 1 through 47 inclusive are realleged and incorporated herein by reference.

50. Defendant made false representations of material facts in the Contract as more particularly described above in paragraphs 22 through 25.

51. Defendant made false representations of material fact in each draw request as more particularly described above in paragraphs 26 through 27.

52. Defendant made material misrepresentations regarding the use of the funds, the materials installed, the workmanship quality of services, and the extent of his insurance as more particularly described above in paragraphs 28 through 43.

53. These misrepresentations and omissions constitutes actual fraud, false pretenses, and false representations.

54. Defendant engaged in deceitful behavior with the specific intent of misleading Plaintiffs and inducing Plaintiffs to enter into the Contract, execute the Loan Agreement, and fund the draw requests of Defendant.

55. Defendant engaged in such surreptitious behavior with the knowledge that the representations he made in the Contract, in the draw requests, to TD Bank, to the Building Department, directly to the Plaintiffs, and to others were false or with reckless disregard of the truth thereof.

56. Defendant engaged in such surreptitious behavior knowing that these false representations of material facts would mislead Plaintiffs, and such surreptitious acts were undertaken to mislead Plaintiffs.

57. Defendant intended to and did deceive Plaintiffs with this surreptitious conduct as Plaintiffs had no idea that Defendant was making these misrepresentations and that he had no intention of meeting the obligations in his misrepresentations.

58. Plaintiffs acted upon Defendant's misrepresentations in reasonable reliance upon their veracity, in that Plaintiffs executed the Contract and the Loan Documents, and authorized and funded the draw requests.

59. Had Plaintiffs known that Defendant's representations were false when made, Plaintiffs would not have executed the Contract, the Loan Agreement, or the authorizations to fund the draw requests.

60. On account of the above, Defendant owes a debt to Plaintiffs for money, property, services, or an extension, renewal, or refinancing of credit, which Defendant obtained from Plaintiffs by means of false pretenses, false representations, or actual fraud.

61. Pursuant to 11 U.S.C. § 523(a)(2), the debts described herein are nondischargeable.

WHEREFORE, Plaintiff requests judgment (a) determining that the debts of Defendant as described herein are nondischargeable, (b) determining and liquidating the amount of damages

owed by Defendant to Plaintiffs, and (c) providing for such other and further relief as this Court may deem just and equitable.

**COUNT II**
**Determination of Non-Dischargeability**
**<u>Pursuant to 11 U.S.C. § 523(a)(6)</u>**

62. This is an action to determine the non-dischargeability of certain debts pursuant to 11 U.S.C. § 523(a)(6).

63. Paragraphs 1 through 47 inclusive are realleged and incorporated herein by reference.

64. As more particularly described above, the actions by the Defendant in intentionally using inferior, defective materials and unworkmanlike service resulted in the willful and malicious injury to the property of the Plaintiffs.

65. As more particularly described above, Defendant's actions have cause injury to Plaintiffs' home which Defendant knew or was reasonably certain would occur on account of the actions taken by Defendant.

66. As more particularly described above including paragraph 44, Defendant's actions have caused the Plaintiffs to suffer damages as a result of the injury to Plaintiffs' property.

67. Pursuant to 11 U.S.C. § 523(a)(6), the debts described herein are nondischargeable.

WHEREFORE, Plaintiff requests judgment (a) determining that the debts of Defendant as described herein are nondischargeable, (b) determining and liquidating the amount of damages owed by Defendant to Plaintiffs, and (c) providing for such other and further relief as this Court may deem just and equitable.

Dated this 24th day of August, 2016.

*/s/ Michael A. Nardella*__________
Michael A. Nardella, Esq.
Florida Bar No: 51265
**NARDELLA & NARDELLA, PLLC**
250 E. Colonial Drive, Suite 102
Orlando, Florida 32801
Telephone: (407) 966-2680
Facsimile: (407) 966-2681
Primary Email: mnardella@nardellalaw.com
Secondary Email: akeppel@nardellalaw.com

**Attorneys for Mark and Colleen Rediger**